Good morning. Please sit in court. My name is Attorney Robert Mitchell. I am appearing on behalf of the appellants, Fangsrud Von Esch. For purposes of brevity, I'm going to refer to my clients as Fangsrud. It will be a little bit easier for the court, I think. For purposes of logistics, just some general housekeeping, I'm going to try to limit my argument regarding the collection agency in this matter, asset, to five minutes. My colleague, Mrs. Sarah Ellen Hutchison, is going to then address the Consumer Protection Act claims which fall under the Washington State claims against the hospital. I think she's going to try to limit hers to five minutes as well, and then we're going to try to preserve five minutes for a rebuttal that we'll probably share. So with that – All right. Your choice, but watch your clock because we're going to keep you to it since there's so many counsel arguing in so many different configurations. I will absolutely try to do my best. Thank you. With that, the claims that I'm going to be discussing today will be the claims, Fangsrud Von Esch's claims against asset, the collection agency. The paramount claim at issue is the Fair Debt Collection Practices Act. The Fair Debt Collection Practices Act is a federal statute that prohibits debt collectors from doing certain things like threatening to collect debts that the consumer does not owe or attempting to collect debts that the consumer does not owe. The judge dismissed these claims at summary judgment, so this court will take a de novo review of these claims, and we need to keep in mind the summary judgment rule as we go forward. The two issues that Fangsrud points out with the court's ruling, what we believe is reversible error, is the bona fide error defense, which I may refer to from time to time as the BFE, and then just the reasonableness standard, the findings of viewing facts in the light that are not most favorable to the non-moving party. As far as the bona fide error defense, luckily for us here today, this court has already ruled on this very same fact pattern repeatedly, most recently in McCulloch. What the bona fide error defense says, it is the only affirmative defense under the statute, and what it says is that it needs to be narrowly construed. It has two elements, both of which need to be affirmatively proved. The first is that the collector lacked intent to commit the alleged misconduct, and the second element is that the collector maintains procedures that are reasonably adapted to avoid the specific error at issue. Now, in this case, the defendant asset did not even plead the second element. They simply cite to the statutory language that it requires maintenance of reasonable procedures, and then they just default to an argument that they reasonably relied on their client's representations, so the representations of the original creditor. And what should asset have done in order to fulfill the second part of the defense, the one at issue here? Asset needed to articulate, affirmatively articulate and affirmatively prove that they maintained reasonable procedures that are adapted to avoid this error. And in this case, for example, what would that have entailed on the facts? That they had a procedure or a policy in place that they actually followed in this specific case that would have prevented the error at issue. Does that answer the court's question? Well, not really. I mean, so you're telling, I don't want to know about policy in the abstract. I'm asking on the facts of this case. What's asset supposed to do when she says, I don't owe this money? Well, just to make sure that the facts are clear, Your Honor, it wasn't just her. It was also her insurance company sent over documented proof that she did not owe this money. Okay. So, yeah, as soon as they're on notice that, hey, wait a minute, they say the money's not owed, what's asset supposed to do? I have seen a lot of collection agencies suspend that account. They place it over into, let's call it an escrow, it's off to the side, while they actually conduct a reasonable investigation. What I have seen a lot of collection agencies do is stop collecting when there is a serious question about the validity of a debt. But they're supposed to do something. They're not supposed to just keep trying to collect it. Correct. In other words, the representation isn't sufficient. The representation from legacy is not enough at that point. At that point, you need to do something else. That's absolutely correct. This Court has found that in Clark. They found it in Reichert, and we found it in McCullough, that simply relying on that representation alone is insufficient. In Reichert, this Court stated that— Once the alleged debtor says, wait a minute, I don't owe it. Absolutely. At that point, when we move from Section G of the validation and verification portion of the statute to the actual offense portions of the statutes, E and F, strict liability attaches at that point. At that point, they need to actually show procedures and not just a reasonable reliance. Reichert found that the fact that the creditor provided accurate information in the past cannot in and of itself establish the reliance or the maintenance of procedures. The debt collector also has an affirmative obligation to prove the maintenance of reasonable procedures. In this case, they didn't even allege it. The only allegation in this summary judgment is that they relied on the original creditor's representations and that they reasonably did so because that creditor has not given them incorrect information in the past. This Court has rejected that in the last three times that they reviewed the FDCPA in Clark, Reichert, and McCullough. The second portion of this is that in order to take advantage of that and get out of jail free card under the bona fide error defense, you are also required to only present the balance that was represented to you from the creditor. In this case, the erroneous balance, it turned out to be wrong, but the balance that was represented to Asset was a $5,300 and some change debt. Asset's final bill, after there had been many disputes, Asset's final bill was almost $1,800 more than that because they attached interest. That gets us to the Reichert case where the collector added extra amounts to the debt. It also gets you to five minutes plus. Oh, wow, and she's going to start barking at me. I'm going to wrap it up real quick, Your Honors, and I appreciate the time warning. The other part is that they claimed that there was reasonable reliance on the creditor. The consumer claims that that reliance was unreasonable because she disputed, the insurance company disputed, her attorney disputed, and they had documents, the collector had documents in their possessions proving or at least suggesting that this account was not correct. So under a reasonableness standard... Thank you. You better let your colleague take it from here. Thank you, Your Honor. I appreciate it. May it please the Court, Your Honor, I am Sarah Ellen Hutchison. I also represent the appellants, Fangsred von Esch, and I will address the claims against Legacy Salmon Creek Hospital. So this is on appeal from summary judgment. It's reviewed de novo, as you know. And the substantive underlying law that the trial court incorrectly applied is the Washington State Consumer Protection Act, which is a broad remedial statute that is to be liberally construed to affect the protection of the public. I will address the issues of injury, followed by unfair and deceptive. The injury occurred here as soon as they were sent the bill for more than they owed. Injury is distinct from damages. You don't need to prove that any actual dollar amount left your pocket to be injured for purposes of the Consumer Protection Act. But what I have some trouble with on this theory is that every billing error would turn into a CPA claim under your theory. Is that your position? That's not our position, actually. A billing error that is so persistent here and has the origin of a deceptive act absolutely makes a prima facie case under the Consumer Protection Act. Now, why do you call it the origin in a deceptive act? What does that mean? Well, what happened was Legacy Hospital used some creative accounting. When they got the batch payments in from Kaiser, they chose to short someone's account, and then that person got sent to collections. No, no, we understand that. But why is that deceptive within the meaning of the statute? I mean, what they intended to do, but didn't do, was we'll charge her $5,000 just so that the $800-and-some-thousand will go through, and then we're going to go back and credit her just to kind of wipe it off the book. But they forgot to do the second thing, which results then in the erroneous bill. Why is that deceptive within the meaning of the statute? As the Washington State Supreme Court described in Panag, you don't need to intend to deceive someone for your act to be deceptive. It merely needs to be a representation or even an omission or a practice. All of those can be deceptive for purposes of the Consumer Protection Act. But then they also give you this leeway under Washington law where the plaintiff or a grieved person would follow up. Did that happen here? By the hospital following up? Well, basically saying there's a problem, there's an error here. What happened here was, as you know, the appellant repeatedly disputed. And some of the times that she called in to customer service at Legacy, they were telling her a completely different reason why they were claiming such a large bill when the customer service people had the EOB showing that the insurance had paid the full amount right there in front of them. And they're telling her something different. If that's not deceptive, it is at least unfair. And it's always supposed to be broadly and liberally construed to benefit the consumer. The argument of unfairness is, in a way, it almost replicates the argument as to asset. That is to say, she complains. Now, it takes her a while to do so. But when she complains, they either don't understand or are willfully blind to what's in front of them and continue to maintain the erroneous debt. That's the argument, then. That's why that's, if not deceptive, at least unfair. Correct, Your Honor. That is an extent of unfairness and an extent of deception that makes this a particularly egregious Consumer Protection Act case. The origin of the whole problem was not just an isolated error. It was a decision of how the hospital chose to treat this accounting problem. And then the callousness that they showed this appellant, this particular consumer, again and again, after they knew that they had this problem, is something that should go to a jury. The damages, as the Washington State Supreme Court has said under Clem, those do go to the jury. We've established the injury due to the expenses that she incurred, meaning the investigation expenses, which, as we know from PNAG, are damages under the Consumer Protection Act. The investigation expenses, the time, the lost vacation time, the lost stipend that her husband did not get at his firefighter shift, all of those are concrete, and it would be up to the jury to determine which of those flowed from the unfair and deceptive acts of the hospital. Would you like to reserve the remaining time? I would. Thank you, Your Honor. Good morning, Your Honor. May it please the Court, I'm Jeffrey Hassan. I'm the attorney for Asset Systems. I'd like 10 minutes for my argument and reserve five for legacy argument, if that's okay with Your Honor. This case presents the Court with a novel issue of an undiscoverable error by a collection agency. What do you mean, undiscoverable? Well, there's nothing in the record that would show how Asset could have discovered the mistake that occurred by Legacy. The mistake that occurred... Did Asset even try? There was nothing that Asset could try to do. Did Asset call back to Legacy and say, hey, we might have a problem here? They did. With regards to the itemized statement, the itemized statement was exactly what Asset was asking for. So there was nothing that Asset could have done to discover this particular error. The itemized statement from Legacy had the amount that Legacy had credited for the insurance coverage. Let me ask you this. What does the record show in the summary judgment sense with the evidence favoring them? What does the evidence show as to what Asset did when the plaintiff says, I don't owe this money? Did they call Legacy? They obtained an itemized statement, Your Honor. That's not quite my question. Did they contact Legacy to say there is a problem? There's no evidence in the record that Asset called Legacy to ask if there was a problem. So they just relied on the information they already had? No, Your Honor. If I may, if I can go back in the records, what it will show is that for the first few, there was almost a year or so, Legacy was sending out statements with this amount, with the amount that had been credited to the debtor. There was no response from the debtor. Asset sent their first notice in 2014 to the debtor. The debtor didn't respond. So 2016, Asset contacts the debtor, and the debtor says, I didn't receive the first notice. So Asset sends its first notice where it hasn't been disputed by the debtor at all during this period of time. Seven days later, the debtor then contacted Legacy and says this amount is wrong. And Legacy then did the investigation, and it turned out, and Asset, after that period of time, Asset received an itemized statement from Legacy that confirmed the same amount that they had when it was first disputed in January of 2016. There had been no change. So the time that Legacy finally wrote the account and found a mistake was because the explanation of benefits was sent in August of 2016 after Asset's letter, well after Asset's letter, and was sent to Asset, who then forwarded the explanation of benefits to Legacy to review. At that point, Legacy discovered the problem. So there was no way that Asset could have discovered this computer glitch that was internal with Legacy. There was a credit for the Kaiser insurance. The problem is that it wasn't a credit for enough. And the reason for that was because Legacy received from Kaiser, they received a number of accounts. In this case, the particular account for the Esch account, there was 160 accounts that were paid by Kaiser under that scenario. What the problem was, and what Legacy's information shows, is that the Kaiser information didn't match up to the amounts that were owed by those 160 debtors. And so, therefore, the way they were... We understand that part, but I'm much more interested in terms of what does your client do when the debtor or the alleged debtor says there's a problem? And you're saying, well, they kept relying on Legacy. They relied on Legacy, and Legacy... And how much contact did they have in the sense of going back to Legacy and saying, hey, there's a dispute here? Well, they stayed out of it, primarily. And while they stayed out of it, did they continue to try to enforce the debt? Not initially, Your Honor. Well, not initially is kind of a weasel word. After they knew that there was a dispute, and after, as it were, they were staying out of it, did they make any attempts to collect the debt? From January of... The answer is yes. Yeah. And they even made, according to their evidence, threatened a lawsuit. They made it, but only after, from January of 2016 through March of 2016, the debtor was working with Legacy because of the dispute on the debt, at which point Legacy did not find the dispute on the debt. And Legacy's own records show that Legacy didn't find it and confirmed the amount of the debt. It was in March of 2016 that a communication occurred that was asking for recovery of the debt. So it wasn't discoverable by asset at any point. As a matter of fact, it wasn't discoverable by Legacy until August of 2016. That may be quite a different question as to when it was discoverable by Legacy. I'm sorry? That may be quite a different point as to when it was discoverable by Legacy. Maybe not discovered by Legacy, but discoverable. I think it was discoverable a long time earlier by Legacy. And you don't want to be in the position that if any Legacy hit that, they're not your client. Right, Your Honor, and that's not my... From your client's point of view, at what date do you put yourself on notice that there's a problem? August of 2016. Oh, not till August. August of 2016. Because when the letter isn't answered, there's a follow-up by your client, right? I'm sorry? There's a follow-up by your client, and then the individual says... No, Your Honor, it's not really a follow-up. An inquiry? No. In January of 2016, these are the things within the one-year statute of limitations. Right. So in January of 2016, because she didn't receive the first notice, Asset sent the first notice to Mrs. Esch. In June of 2016, Mr. Esch had not communicated and did not communicate with Asset at all. In June of 2016, the first notice to Mr. Esch was sent. Okay. They have to send that within five days of the initial communication. It wasn't a follow-up communication as you would generally have. If you look at the wording of the language, it was a first notice, unless you notify this office within 30 days that you dispute the debt. That's what it was, and that's why one was sent to Mr. Esch and one was sent to Mrs. Esch. Because you can't communicate unless you have to send that letter within five days of the initial communication. And then you say it's not until the August 2016 period that you're really on notice that there is some problem here. In August of 2016, the explanation of benefits was received by, and I believe it was Asset, and Asset forwarded that to Legacy. We're on notice at that point. We do nothing after that point. As a matter of fact, Legacy cancels it at that point, returns the $100 that had been paid by Mrs. Esch, and also tells us to cancel the other $300 that would have been due had it been properly credited by Kaiser. So all of those things occur. This is a situation similar to the Clark case. The difference, Clark said that, logically, if a debt collector reasonably relies on the debt reported by a creditor, the debt collector will not be liable for any errors. On the other hand, the bona fide error defense will not shield a debt collector whose reliance on the creditor's representation is unreasonable or who represents to the consumer a debt amount that is different from the creditor's report. In this case, that was also a similar case where the summary judgment had been granted to the defendants, just like this particular case. What the court eventually found was there was evidence put on by the Clarks that the reliance on that particular creditor was unreasonable. And because that evidence was put on and because the defendants did not put on any evidence contrary to that, there was a question of fact as to whether the reliance was reasonable. That's why it was sent back. The cases of Reichert and McCullough are quite different from that. They were cases in which the plaintiff received summary judgment and the claim was that the error was discoverable, and in each of those cases it was. With regards to the Reichert case, the $225 charge was apparent on the letter that was sent out. So just because you rely on the creditor when it's on the face of the letter... That's a notice issue. Yeah, you're absolutely on notice. They want to wrap it up so we can... Okay, I'm sorry. And with regards to the other case, the McCullough case, the statute of limitations was in the file. Even though the client had represented the wrong amount, had the attorney reviewed the file, the attorney would have seen that the amount that the collection agency represented to them was wrong. We'd ask that you affirm. Thank you. May it please the Court. Aaron Rinchey for Legacy Hospital. The overarching question that the district court was faced with with regards to Legacy in this case was, if a debtor receives an erroneous bill and she knows it's erroneous and she knows she has a balance due and she chooses to ignore the bill, not make any effort to call the creditor's attention to the error and not make any effort to pay the balance that she knows she owes, can she then sue the creditor when the creditor eventually sends the account to collections? The district court correctly found that that is not a proper use of the CPA. What she's supposed to do when she knows that she owes $400 and she gets a bill for essentially $5,000, she obviously knows this is a mistake. And I must say I'm bringing a little bit of my own commonsensical experience to this. I get crazy bills all the time from the hospitals and from the insurance companies and so on that are not real bills. They look like they are, but they're going to correct them. We get these papers with these funny numbers from health care providers all the time, and my experience is I just have to wait until they send me the one that says, actually, this is what you owe. I think she behaved the way many people do when they get crazy bills from hospitals. Well, this isn't wrong. This is one of these crazy bills. They'll send me the real bill one of these days. And I don't necessarily disagree that that – Well, we got those crazy bills too. It says this is not a bill. Well, yeah, but this did not say it was not a bill. I know, this did not say it was not a bill. It was a bill. What she gets from the insurance company is what says it's not a bill. What you get from the hospital is what you're supposed to pay. And I don't disagree that I might have done something similar to what she did in that situation. But what I wouldn't – I would know that in ignoring it, I'm taking the risk that this account gets sent to collections somewhere down the road. She specifically testified that she knew it would be sent to collections if she didn't do anything about it. And what I would not do is sue the hospital when that happened because I – Well, but what happens is not just that she doesn't pay, she doesn't pay, and then she brings suit. She doesn't pay. Then the hospital sends it to collections. She objects, and the hospital takes a really long time to sort out its own mistake. And meanwhile, she's being threatened with lawsuit by legacy. She has to retain a lawyer. And the underlying problem is your mistake. She was never threatened with a lawsuit by legacy. Is that a fact? That is an absolute fact. There's never been any evidence of legacy ever suggesting the possibility. Okay, let me just ask you about that. Is that a factual issue because she alleges that? She has not alleged that either. She alleged in the call notes that asset said. Yeah, no, no. You said never threatened by a lawsuit by legacy, and I think that's correct, but was threatened by a lawsuit by a collection agent, yeah. Right, and she denied that in her deposition. So – Well, I don't know that she denied it. She didn't mention it when asked about communications. She was asked if asset ever threatened her with a lawsuit, and she said no. Okay. Now, she did say that they mentioned the possibility, and she felt that there could be a lawsuit coming, which is the way collections works. I agree that it took a long time, and legacy agrees, it took a long time to sort this out. And legacy will be the first to tell you that the customer service in this case was not what it should have been, and that was why they refunded a $100 payment that she owed and waived another $300 that she undisputedly owed. However, poor customer service and taking too long to fix a billing error is not a Consumer Protection Act violation. And it is something that happened in the nature of the error that happened here, that after the fact, legacy realized, wow, if this error happened, there would be no way for our customer service people to see it, and that's why it took so long. As soon as it got to Dale Andrews' desk, the gentleman who managed the reimbursement team, as soon as it reached his team, he went back and did an audit and found the error and fixed it, and there was the refund and the write-up of the other $300. But it did take a long time to get there. Taking a long time to sort out a billing error is not a Consumer Protection Act violation, and for that reason I would ask the Court respectfully to affirm the trial court's correct decision. Thank you. You have just under four minutes to use however you may wish. Thank you, Your Honor. I'm going to be really quick and just address the FDCPA portion of this. I think it's important for this Court to understand the actual chronology of this case. There were a lot of references to August of 2016, and the way that this case actually unfolded was in March of 2016, the insurance sent an EOB over to the hospital that said this debt has been paid all but $400. That was in March of 2016. If the collection agency had been communicating with the creditor as they said that they did and relying on the creditor between March of 2016 when that EOB is in their own file showing that the debt was paid and the collection notice in June of 2016, which is three months later, they would have learned. But they obviously either were not in communication with their own client as they say that they were or that communication was deficient because the proof from the insurance company that this debt was paid was in their files in March of 2016. It wasn't in the legacy's files. In the legacy's files, correct. What legacy did with it, we're unaware. The threat of the lawsuit is the last thing that I'm going to touch on and then yield back to Sarah Ellen. Their own collection notes show that the plaintiff, Mrs. Fangs-Rudvon Ash, believed that she was threatened with a lawsuit. Their own collection notes show that she called and said, I have to get this taken care of because they're threatening to file a lawsuit against me. Those notations are in the record at 32, 33, and 34. The 32 and 33 is the reference to the insurance payments that were made, 33 and 34. The record is full of references of Mrs. Fangs-Rudvon Ash believing that she was threatened with a lawsuit in this case. For our purposes at this stage, we believe that. That's a fact-finding issue. Outstanding. And that's all I have. I'm going to yield the rest to Sarah Ellen Hutchison unless the panel has any questions for me. Outstanding. Thank you. Thank you. I will quickly address Legacy's arguments. Both of them were rejected by the Washington State Supreme Court in Panag. And basically, just because you might owe $400, it doesn't mean we can demand $5,000. It doesn't mean we can demand $7,000. It is reasonable for people to wait for the crazy bills to go away so the real one comes in the mail. Mrs. Fangs-Rudvon Ash testified. It's at ER 173 in the record that she was afraid to make the payment of $400 that she knew that she owed because she was not sure that it would be correctly applied. I don't know why she would have thought that. I don't know why she would have thought that. That seems a fairly weak defense on why not pay what you know you owe. I mean, she doesn't have any knowledge that it won't be applied at that point, does she? That is for the jury to decide whether, you know, that was a reasonable assumption for her to make. But Panag protects the person in that situation. It says a person's blameworthiness with respect to insurance coverage is not relevant in deciding whether collection practice is unfair or deceptive. The focus is on, you know, the conduct of the collection agency, of the creditor. And it was the bill can still be deceptive if, in the act of asking a person for $5,000, you're spending time and money running around trying to find out what's going on and protect your interests. Panag did have situations where the people were at fault and, you know, had some responsibility for some of the money that was being demanded of them, but that did not make the communications to them not deceptive. Just because part of it is true, it does not mean that you can still be deceived and injured by those collection efforts. Thank you. Thank you, Your Honor. Von Esch versus Legacy and Asset is submitted, and we'll take a short break.
judges: McKeown, W. Fletcher, Gould